First case this morning, Maryland, is number 213-0677, Jamie Francisco, plaintiff, v. Jonathan Pinsky, et al., defense. Arguing on behalf of Dr. Gregory, company, and Lena, Mr. Robert M. Larson. Arguing on behalf of Jamie Francisco, Mr. Robert G. Black. Arguing on behalf of Dr. Jonathan Pinsky and his West Infectious Disease Specialist, Mr. Hugh G. And thank you gentlemen very much for coming to a resolution about how you'd like to share your time because I was back there going, I don't know. So you know what you want to say and hopefully we've given you sufficient time. Alright, then we would start with Mr. Larson. Thank you. Justices, counsel, may it please the court. This case involves a patient who suffered a reaction, a plaintiff alleges, due to a drug called allopurinol, a drug used to treat gout for patients in end-stage renal failure. It is plaintiff's allegation that this drug, which was not prescribed by my clients, caused a reaction, not from its initial administration, but through a process called re-challenge. Whereby the patient is given the drug, they get off the drug, and then when they get on the drug again, they have this virulent reaction to the drug. There are many issues that are in dispute in the case, and we'll articulate some of them. But for purposes of time, I'm going to focus on a few of the issues that I think are most important to this court's determination of this appeal. Let me ask one question before you go there so I don't interrupt you. Certainly. There are allegations or there are issues about if it was the allopurinol that should have been finished with it by the 18th of October, because this actually is occurring from about August of 2005 through November of 2005, at least the primary. In making that determination of October 18th, does that take into account the hospital stays where she may or may not have been given that medication? Because they usually don't take your own medication into the hospital. Right, Your Honor. What had happened was she was prescribed the medication on August 29th, and based upon the information that became available later, it was determined that had she taken her medication during the timeframe between when it was first ordered in August and when she was hospitalized on October 18th, as prescribed, she would have run out of the medication and therefore could not have had any medication when she was discharged from the hospital on November 2. She wasn't hospitalized before October 18th? She was in for a day or two. For the chest pains, wasn't it? Right. Okay. But even factoring that in, she would have run out of the medication before she entered Central DuPage Hospital on October 18th, and therefore, so one of the arguments that we've posited is that either she was not compliant with the doctor's orders, which is certainly relevant to the jury's determination as to whether Dr. Cozney or Dr. DeJesus could have told her anything that would have caused her to comply with the doctor's orders, or she did, in which case something other than the allopurinol caused the re-challenge reaction after she was discharged from the hospital. Now, does the calculation of October 18th also take into account the days? It looks like she's going to dialysis almost every other day or maybe every third day, depending on whether it falls on a Sunday or a Monday. Does it take into account she probably, she should have taken them on those days, too? Yes. Okay. I just wanted to know the figures because I couldn't figure it out. Absolutely. Thank you. So as you have noted, there's some medical evidence that suggests that allopurinol can cause this sort of re-challenge reaction. There are many other medications that can as well, and there's evidence on both sides of that, none of which is anything that a plaintiff's expert was involved in studying or reviewing, and we'll speak to those issues. But one of the issues we raised was the fact that the entirety of the plaintiff's case, with respect to Dr. Cozarty, Dr. DeJesus, and Annie and I, or Nannie as we call them, relies entirely upon the testimony of their one standard of care expert, Dr. Alon Vayner. Now, Dr. Vayner, they argued in their briefs that there was other testimony out there that also addressed standard of care issues, but they haven't cited any because there's none to cite. In fact, if you look and we cited in our brief the statement of the plaintiff's counsel in the jury instruction conference where he said, standard of care issues comes from Dr. Vayner as to Dr. Cozarty and Dr. DeJesus. So really their case on standard of care rises and falls on the testimony of credibility and the foundational basis of the testimony of Dr. Vayner. So as to Dr. Cozarty, we've set forth why we don't think the jury should be able to rely on that testimony. First and foremost, well, first of all, Dr. Vayner has never treated a patient with TEN or this toxic epidermal necrolysis. Who in this case has? Only a couple of the people who treated her at the very end of the illness, I believe. I think maybe Dr. Soltan had. I don't think they said that. Didn't Dr. Soltan say she had never diagnosed TEN, had never seen it, but this was the first time she had diagnosed it? So it's an extremely rare condition. Right. So is it unusual that one couldn't find an expert that had diagnosed this before? Well, I think the fact that the physicians who happen to have been involved in this case were the ones who studied this disease is certainly a rare disease process, but it's one that has been studied, it's been written about, it's been published about, and there are physicians who have treated this condition, just not the plaintiff's expert. Right, but the plaintiff's expert studied about it and knew about it, he just never treated it. I don't know that he ever indicated he studied about it. He was aware of it, of the condition, and it was his belief that it was associated with allopurinol, but he never specifically studied that particular interaction. Doesn't that go to weight? Arguably it could. But I think in this case we believe it goes to foundation as well, but there are other bases upon which we feel that his foundation is lacking. So the second issue that he has, he's never seen this reaction, but the most important issue is Dr. Vander was asked to articulate the standard of care applicable in this case, and he articulated the standard of care as a minimum level of treatment that the physician should be able to give to the patient based upon the standard in the community and medical school training. Now, that is not the standard in Illinois. It never has been. Plaintiff's counsel had every opportunity to correct that, every opportunity to say, Doctor, can we agree that the standard of care is what a reasonably well-qualified and careful physician would do under these circumstances? He was never asked that question. Did the jury instruction set out the correct standard of care? The jury instruction did, which I believe is part of the reason why it's so important, and we'll get to this later, the comments by plaintiff's counsel in closing argument where he says, Dr. Kosanyi didn't look you in the eye and say he complied with the standard of care, because the jury heard one standard of care from the plaintiff's liability expert and was reading another one in the jury instructions that Dr. Vander had never testified to. So plaintiff's counsel jumps up and says, well, gosh, Dr. Kosanyi didn't tell you he complied with the standard of care. Now, isn't the standard of care kind of confusing even for us in the legal field? It may be, which is all the more reason in a closed case that I think it's very important that it be articulated properly, both in the testimony of the expert and in closing argument, and that it should never be suggested that it's the obligation of the defense to prove that the doctor complied with the standard of care. But Judge Souter gave a corrective instruction, jury instruction immediately thereafter, did he not? Well, the way it played out was that he, the defense counsel, made the decision that we don't want to emphasize the point. We're going to wait until the closing arguments are complete, raise the issue with the jury, with the judge. He then gave the instruction, which of course is now the last thing the jury hears, is a reiteration of this issue at the end of a four-week-long trial where he doesn't have an obligation to tell you that he complied with the standard of care. But this is ringing in the jury's ears as they're going through the motions. All the better for you. I mean, the last thing they heard is, hey, he doesn't have the burden. It's the burden of the plaintiff to set out, you know, to prove that he didn't meet the standard of care. One could argue that, correct? One could argue that. I think the long history of jurisprudence suggests otherwise. You know, when you look at a criminal case, for instance, no defendant wants to hear the judge say, he doesn't have to get on the stand and prove his case, because that's essentially saying, well, he doesn't want to get on the stand and prove his case. And the jury interprets it and hears it. They may hear and understand that he doesn't have the obligation to do so, but they're being reminded that he didn't do so. Well, that's a lot of speculation, and we don't have any expert, any jury expert here to tell us that. You're asking us to reverse a verdict from a jury. What is your standard here? With respect to conduct of counsel? Yes. I think it's the one actually that was articulated by this district in the case that I cited, which was the Niewold v. Frye, which says the burden is on the plaintiff to prove negligence, not on the defendant to disprove negligence. And that court found that it was improper for the opposing counsel to suggest that it was the obligation of the defense to do so. Isn't it an abuse of discretion? What is the standard for us to reverse a jury's verdict? Well, I think to reverse a jury's verdict based upon the conduct of the defense counsel is, I think, would be probably an abuse of discretion standard because you'd be evaluating, the trial court would evaluate. Obviously the trial court here felt that what counsel did was very wrong and said so. Right, so an abuse of discretion. I believe so. All right, Mr. Larson, you said that the jury had the proper instruction, and I am now looking at what you just read, and I am a juror, and I'm listening to it for the very first time. And I have a pad of paper and a pencil in my hand, and I'm trying to contemplate what you're saying. I can't write that, let alone remember that necessarily at the same time you're saying it. But they have the proper written instruction in their hand. The fact that he said something that was inaccurate but later that identified what he felt were the issues that led to that violation of the standard of care, how can you say that his definition creates such a problem with his total testimony in this case? Well, because it speaks to his view of the evidence. He was not testifying to the standard of care the jury was considering. He was not speaking to the standard of what a reasonably careful doctor would do. He was speaking to what he considered to be some minimum level of treatment that was required in his mind, and therefore all of his testimony was based upon a standard that doesn't apply in Illinois law. I mean, he could have come in and said, my standard is that doctors have to do the best they can possibly do, and they have to get it right, and therefore here's why the defendant deviated from the standard of care. And the fact that the jury was read an instruction and said something different wouldn't cure the fact that the expert came in and was testifying to a standard that isn't the law in Illinois. But I guess my point is I can remember the first two words, or the first three, the minimum requirement. That's all I can remember, and I've read it probably 15 times in the last five days. I just don't understand how you think that the jury was confused or somehow misled by that. Well, I think there are two things. One is not just that the jury was misled, but the doctor was giving evidentiary testimony to the wrong standard. So in other words, when he's saying they were required to do X, they were required to do X not because that's what a reasonably careful doctor would do. They were required to do X because in his mind this is some generic minimum requirement that he sees. So his testimony was based upon his standard, not based upon the standard that was read to the jury. So there may be confusion to the jury, but it also invalidates his testimony because he's talking about standards that he thinks are the standard, not what the law in Illinois is. But could one argue that then the standard that the jurors got in the jury instruction, in conjunction with the testimony of Dr. Vainer of what he said Cozney did or didn't do, and the testimony elicited from Dr. Cozney, either on direct or on cross, that he acknowledged that both the emergency room and the floor nurses indicated that the decedent was taken out, couldn't one assume that the jurors took all of that testimony and applied it to the correct standard of care that they received? But again, that assumes that the doctor gave them that information. The doctor was testifying to a standard that was higher than Dr. Vainer. Right. So for the jury to interpret his testimony by a different standard than what he was actually testifying to changes his testimony. It might have been, doctor, if you asked him, doctor, when you say they were required to take a history or to stop the medication on this date, is that what a reasonably careful doctor would have been required to do or simply what some minimum standard that you think about was required here? And we don't know how he would have answered that question because he wasn't asked that question. So to have the jury apply a different standard and alter his testimony to meet the standard read to them, I think, changes the entire nature of the case because now they're applying a standard he didn't testify to. So whether they were confused or not, that's not the evidence that they were given to rule upon. So that's the issues I see with respect to Dr. Vainer. Now, I think the next important thing and a very important critical issue here is the proximate cause issue. And I laid out in great detail what this issue is and the fact that I believe that the critical part of Plaintiff's case was not put into the issues instruction and the jury was not asked to decide it. In other words, Dr. Vainer said a couple of things. They needed to find out that he was on allopurinol or she was on allopurinol, although he doesn't say and the instruction doesn't say needed to find out the dosage and the use during the time. It just needed to find out. Well, it would have been nice if everybody was consistent on at least that she was taking it. I mean, we have significant inconsistencies in that regard. Absolutely. And that makes it difficult to say that they met their inventory burden to establish it. But then they say on October 10, or in Dr. DeJesus' case on October 12, should have told her to reduce the dosage to 100 milligrams. Now, she had already undergone a substantial reaction, they argued, to the allopurinol up to that point. No one has testified, gosh, if she had just been reduced to 100 milligrams as of October 10, none of this would have happened. And certainly nobody had said if she was reduced to 100 milligrams and then she goes into the hospital on the 18th and the medication is stopped, then she wouldn't have the rechallenge later when she restarted. So that's not proximate cause, nor is there finding out about the fact that she was on allopurinol. That's not proximate cause. The last issue that they articulate is that the medication should have been stopped while she was in Central DuPage Hospital. That's what the instruction specifically says. And that's what already happened. So whether Dr. Kozny or Dr. DeJesus or anyone else ordered it stopped while she was in the hospital, it was stopped. The critical issue they missed was she needed to be advised in some fashion that she could understand that she was never to take the medication again. But did Dr. Kozny ever tell her that? No. And that is an argument that Dr. Boehner made that that should have been required, except the jury was never asked to consider that issue. It's not in the jury instruction. They were never asked to decide whether that would have been that, which I believe is the only thing that can establish proximate cause because everyone agrees the rechallenge is what caused the death, if you believe it, was the allopurinol that did it. So if that was the issue for being told not to take it again when she left the hospital and they never asked the jury to decide whether the standard of care required Dr. Kozny or Dr. DeJesus to be the ones to give that instruction, then the jury never considered the one issue that would give them proximate cause. Neither Dr. Kozny nor Dr. DeJesus was the physician who did the discharge. It was actually Dr. Brian Boehner. You've seen the evidence that he testified that these are the medications you should take and no others, and he thought he made it clear and so forth. But if plaintiffs were going to ask the jury to decide, wasn't it the obligation of Dr. Kozny or Dr. DeJesus to sit down with her and say, never take this again, get rid of any medications, as Dr. Boehner said, don't even look at it again, that's not in the issues instruction. The jury was not asked to decide that issue, and therefore the jury was not asked to decide the one issue that would have established proximate cause in this case. So when you take that in conjunction with the testimony of the plaintiff's expert, its flaws, you take into account the problem with the plaintiff's counsel, we haven't even talked about his commentary, his speaking objection where he volunteered what every doctor who treated her after she left CDH supposedly knew, even though they weren't being called to testify. When you add all of those things together, I don't think plaintiffs have established proximate cause, and the directed verdict motion should have been granted, or the post-trial motion should have been granted because of the lack of proximate cause, based upon the instructions given to the jury. I also think the defense was denied a fair trial based upon all of the issues that we've raised. I did hear the bell, I don't know if you had any further questions for me. I was just going to ask. You'll have some time for rebuttal. Thank you, Justice. Mr. Black. And thank you and Mr. Griffin for sitting at the same table, even though you're opponents. We have no other tables. They were both sitting at those two tables. Mr. Griffin invited me over by his, so I graciously accepted. So you could be least damaging. Good morning, Your Honors. May it please the Court, Counsel. Again, my name is Bob Black, and I represent the plaintiff in this matter. There's a couple things I know for certain about this case. Number one, the jury heard conflicting expert testimony. Rather, allopurinol and a challenge or restart of allopurinol caused the conditions that led to the deceased's death, and the jury resolved that issue from conflicting expert testimony. Number two, the jury instructions. I've heard many things said this morning about jury instructions, improper jury instructions, jury instructions that didn't match the evidence. Jury instructions are not an issue for this Court. They were not raised in the post-trial motion. They are not in the primary appellant's brief. They were asserted by way of the reply brief. Your Honors all know that the time to raise an issue for the first time is not in a reply brief. Jury instructions here are not an issue. Going to Dr. Boehner, going to his whole, I hesitate to use the word amorphous, but the whole does his testimony meet the standard of care, does his testimony show causation, okay? As to the standard of care, Your Honors have already recognized and already discussed that although it's not raised as an issue, the jury instruction comports with the statement ad vincular that they complain about or contest that is the proper standard of care. All right, but when he, and I even, for the record, I even got his definition wrong. I said it's the minimum level of treatment, so I got the first five. That's all I can remember, and as I said, I've read it 15 times in the last couple days. Why didn't somebody deal with that at the time? And that is the issue, Your Honor, because as I looked at this the first time, I was quite frankly not quite getting what they were getting at in this issue because what they were talking about, and counsel said it this morning, is the foundational requirement of Dr. Boehner. Okay, the law is pretty clear in Illinois, and this is the part I wasn't recognizing perhaps. There was never an issue in this case but that the standard of care was a national standard. It was what? A national standard. It was uniform throughout the nation. It's not different for DuPage County than it is elsewhere. It is a uniform national standard. So if we go back to 1986, Illinois Supreme Court, Purtill v. Hess, and this is the part I wasn't getting, quite frankly. In Purtill v. Hess, you have the challenge to the locality rule, and you have a case involving the Rantoul Hospital in Missouri, different standard of care, and Purtill v. Hess said, we're not abolishing the locality rule, but if there is no dispute that it is a national standard, then that is phrased as, and let me try and find it here because I do get confused myself, if it's a national standard, it testifies to the minimum standards of medical practice. Dr. Boehner testified, minimal standards. Therefore, foundationally, Dr. Boehner's testimony is appropriate on the standard of care and everything else to follow, as per Purtill v. Hess, as per 1986 Illinois Supreme Court decision. And is that echoed then in Sullivan v. Edwards? I believe it is. I looked at it again, and you've got Purtill v. Hess coming down a real straight line, and then you've got Advecular, and then you've got this back and that back. They're still mentioning of the national standard. But the fact of the matter was, if the defendants believed that this was not a uniform national standard situation, something should have been done to object, hey, you can't say. Did he forfeit it then? Pardon me? Did he forfeit it? It was never an issue in the trial court. I would say yes. Wouldn't it have been easier and perhaps on the jury if they were consistent, if Boehner was consistent with what the jury instruction wants, as Mr. Larson said? It probably would have been easier. And I think that this is an area, too, that, like I said, are we dealing with semantics versus non-semantics? I read Purtill v. Hess, and I might be wrong, but I read it as the essential foundational component of a national versus a local viewpoint, that you know that the standard of care in DuPage County is the same as it is in Atlanta, Georgia, in Spokane, Washington, for this type of thing, for a drug reaction to helipiramide. But we're talking about a specialty of medicine. We're not talking about just internal medicine. This is nephrology, right? Correct. So you need the nephrologist to testify accurately in the same school of medicine as to the standard of care. Once Dr. Boehner made this foundational statement that he was familiar with the minimum standards by way of the national standard of care, he then gave a testimony that led the jury down the slippery slope, in his words, of everything that went wrong, okay? that the allopurinol exceeded the proper dosage. The liver enzymes went up upon her initial hospitalization in September for two to three days. Allopurinol is well-recognized for causing a drug reaction. Dr. Cozney knew in his dialysis notes in September and October that she had told people in his office that she was on the allopurinol. You've got the fever. You've got the rash. You've got all these things that are indicative of a drug reaction. But wasn't the vancomycin that she was taking also an indicator for the rash, the fever, the high liver levels? I mean, couldn't one argue that the standard of care, he followed the standard of care, and he, as well as it seems like everyone down the line, thought the vancomycin could have been the problem. There certainly was a lot of indications about people, the doctors, writing it off as a reaction to vancomycin, okay? That, again, dovetails into all the evidence that was placed before the jury and the conflicting experts of what the standard, what happened here that didn't meet the standard of care. What was the deviation from the standard of care? The main one that our biopsy report also tells us about is this is a drug reaction, this is a drug injury, you have to do a thorough drug evaluation in history. The thorough drug evaluation in history is right in front of everybody. In Dr. Vayner's words, it's in black and white. And that thorough drug history says, in dialysis, she's an allopurinol. When she comes into the emergency room, what medications are you taking? Fourth one is allopurinol. That's indicated in the nurse's notes. In the nurse's notes for the hour. If I'm recalling correctly, it may also have been part of the discussion with Dr. Topper, the emergency room physician, but I know for certain Nurse Jonesman, who was a nurse on the floor, was told allopurinol. Now, she had been taking the allopurinol before she came into the hospital. Obviously, once she came into the hospital, there was no more allopurinol. Now, you look at what happened in the hospital. The liver enzymes continued to spike. Eosinophilus, I'm not so good at pronouncing those ones, arose. Still, all classic indications of a drug injury, classic indications as the expert witness testified, that allopurinol is one of the most well-known indicators of a drug injury. Okay, after a while, about the 29th of the month, 29th of October, things start to calm down. She hasn't been on allopurinol for two weeks. Things start to calm down, liver enzymes start to calm down, and she's released. We have two doctors who testified, Dr. McDonald and Dr. Vainer, who testify that in their view it was a virtual certainty that she restarted or re-challenged with the allopurinol. How could they have said that, though? Based upon what? Based upon her conditions as she was admitted to the hospital, based upon how things continued throughout the hospital, how they recessed when she got out of the hospital, and then how it regenerated afterwards. Those are the conditions. It was a certainty in their opinion afterwards that then the levels started to spike again. But my understanding of their testimony was there was almost a certainty that she was going to start taking that again. My question is how did they come to that conclusion? Your Honor, I'm not so certain that there was, and forgive me, I might not be recalling that that was the aspect of their testimony. I believe that their testimony was more like it is kind of here she was, here she got better, here she was again. It's not vancomycin, it's not anything like that. It's been a long time since she's been on vancomycin. It's got to be the allopurinol because the allopurinol is what causes this. But then they were saying almost like, well, he violated the standard of care by telling her not to be on it anymore because it's almost certain she was going to continue to take it. I guess that's speculation. I wonder how it is, if you know, they could come up with that conclusion. No, it's- The fact that she had 11 refills left? She did have 11 refills left, correct. And, you know, obviously it would be much better if we had the decedent to tell us. Let me ask you this, Mr. Black. What is your response to Mr. Larson's statement that Dr. Vayner has never seen or diagnosed TAM before? Well, first of all, I think Your Honor was correct in analyzing this as being an exceedingly rare condition. So I think that it's going to be difficult to get someone along those lines. And quite frankly, I think it's irrelevant to the entire consideration because- Do you think it goes to wait? It absolutely goes to wait, number one. Without question it goes to wait. Not sufficiency and not the ability to tie this testimony into a considered jury verdict such that you've got to go ahead and say, well, you should have given a directed verdict or J&OB. But the train just derailed. Does it also go to wait if an expert, although they're qualified, although they've had a lot of experience, they've had a lot of training, the requisite amount and so forth, to be designated an expert witness? But when they get to the point of testifying as to what the standard of care is, if they misstate it to some degree, does that also go to wait or does that go to actually to admissibility? I think that would go more to wait. I think that if someone misstated the standard of care, then the opponent's expert would point out that they've misstated the standard of care. It seems like that would be right for cross-examination. Without question. Possibly, but- Without question. And what was right for cross-examination with Dr. Vayner were her credentials. How much had she studied this situation? Even if she hadn't seen the 10, how familiar was she with it? What books did she get it from? What learning did she have? What was her background? She said it's something that is taught in medical school. Those were all issues that were right for cross-examination. And it's not a foundational aspect. Didn't Dr. Salton call it for 10s almost immediately upon her admission? Yes. And she had never seen it before either. That is correct. Dr. Salton. I know there was initially Dr. Chiachi, or however that's pronounced, also talked about, well, this is vanco, this is megamycin, this is, I think you said prednisone. I'm not sure. But ultimately what Dr. Salton said was- Did somebody say it might even be Prevacet? Prevacet.  Prevacet. That's it. You're right. I know we got a little late. I know. Thank you. Dr. Salton said definitely this is 10. And then you also have the doctor at the Loyola Burn Unit said 10. And then you have the post-mortem that said this is 10 and she was 62% covered. But they never, they all diagnosed her with 10. Correct. But nobody even at Northwestern ever said it was absolutely the allopurinol that caused this, did they? At Northwestern. Prior to her being transferred to Loyola Burn? Prior to the transfer, no. I believe Dr. Salton's testimony was, now that I've thought about it some more and looked at it, I would have said it was the allopurinol. And although I signed off on Dr. Chiachi's thing, I would have said allopurinol. Allopurinol makes the most sense to me. So there is, as we discussed in our brief, there are other aspects of the testimony that link the allopurinol and the rechallenge to the injury beyond even Dr. Boehner's testimony, sufficient for the jury to consider this issue and sufficient for the jury to resolve the issue. And certainly not in the realm of taking that considered discretion and judgment out of the jury's hands by way of a directed verdict for JNLV. Do you want to talk a little bit about Dr. Pinsky before your time runs out? Certainly. Well, isn't he going to have time after? Well, he'll have time for rebuttal, but he's a cross appellate. I'm also a separate appellate, cross appellate. We're still working on that whole nomenclature. At least mention his name so Mr. Griffith can say something. As to Dr. Pinsky, we did raise two issues. The primary issue that I would address with your honors is the motion to quash. The motion to quash here came about by way of a subpoena for someone to come by from CDH as a records keeper. And it was an unnamed individual. But to come by as a record keeper, to come by and testify to authenticate to this audit trail. And the significance of the audit trail was that Dr. Pinsky testified during his examination that he signed off on October 31. The audit trail showed that he looked at the liver biopsy as of November 2. The liver biopsy report is critical because it says drug injury, do a thorough drug test. But Dr. Pinsky is an infectious disease doctor. He is not a nephrologist, is he? Correct. Yes, absolutely. Dr. Pinsky was brought in to determine whether or not there was an infection here. But he was still part of the overall care. This was a critical piece of evidence. Mr. Black, if it were so critical, why didn't counsel wait until the last minute to issue a subpoena? Violating Supreme Court Rule 237, which says you have to subpoena at least seven days ahead of time. If it was that important, why didn't they wait? I think that there's two responses to that. I'm going to read between the lines. And we've talked about in the brief that they had a working relationship, plaintiff's counsel and CDH's counsel, about accepting subpoenas. He thought that this was going to be another instance where they would accept the subpoena. It turned out that it wasn't. So he issued the subpoena as best as he could. Now, it did not meet the technical seven days within Rule 237. Whether that is then good grounds to quash under Section 2-1101 is something that we've raised. However- But what's our standard of review in reversing the trial? Yes. But on that motion to quash? We have asserted de novo. Dr. Pinsky has asserted that it is abuse of discretion. Well, the court looked at the facts behind the issuing of that subpoena, correct? He looked at the lateness. He looked at the relevance. He looked at- he took that into consideration. Wouldn't that be an abuse of discretion? The court took a look at the fact that- well, the court commented, I'm not sure that there's relevancy. Didn't make a ruling one way or the other on relevancy, but made the comment, I'm not sure there's relevancy. The court also looked at the fact that the counsel for CDH who appeared that morning raised the timeliness. In terms of timeliness, if you are to tie this all up, that Rule 237 mandates at least seven days. We have our background circumstances. The seven days weren't met. That then becomes grounds for a motion to quash for good cause. The seven days still could have been met. The trial continued beyond that seven days. Right. Yeah. It did. But then you look at the 213- there's a 213-F3. And the doctor in the 213-F3 said, you know, he signed off on the report on such and such a date. At that point, would the plaintiff's lawyer would have said, gee, we better get a subpoena on to CDH. Again, an abuse of discretion, correct? I think what we're dealing with is, in many respects, the fact that we have Rule 237, we have Section 1101, and we have basically undisputed facts. In that vein, we are asserting that this is de novo. And in that vein, because the court never gave any grounds for its ruling or stated its discretion, our position, therefore, is it dovetails more into a de novo standard review than abuse of discretion. When you're looking at a report four days or so after one signs off officially, as I think this kind of- it plays out, does that mean you're still in the case? Or does that mean you're just curious? Well- Because you've never seen anything like this either. Right. What, 10? Well, that goes right back to that's for the jury. And it became a critical component in that respect. You said you had two points. What about Dr. Pinsky? Well- Do you remember that one, or do you want to wait for it? I think we've covered them all by way of your questioning, because I want to do the timeliness in the room. Yes. All right. Mr. Shuster. Mr. Stone. Thank you. You will have some time for rebuttal. Thank you, Your Honor. And now, Mr. Griffin. I apologize for moving everybody, but I wanted Mr. Griffin to have a shot. I guess the main shot I have to give you is that I don't know how the dispute between Dr. Poseny and Plaintiff is going to come out. But there's nothing in this record, no matter how you decide those issues, that would at all- that any one of us would agree with. I don't personally support any kind of a change to the judgment on the jury's considered verdict. Dr. Pinsky does testify that he went back and he saw that report from Atlanta, correct? Well- Disease Control, CDC. I just want to make sure. I don't know if it was clear enough in my brief. Page 1408 to page 1418, he's cross-examined on this liver biopsy report. It was an exhibit. They said, well, did you see it at the time? He says, I don't remember, but I might have. And so now he's cross-examined for 10 pages on the content of this and the paragraph that Plaintiff relies on about that drug history should be taken and studies should be taken to determine whether this is a drug injury. He was cross-examined on this whole report for his hand, those whole 10 pages. That was his testimony throughout the trial. I always thought that should be done. That wasn't my job. I was brought in as the infectious disease specialist because Deceden spiked a fever. And so the team, the primary care physicians, wanted to make sure there was no infection. And that's why Dr. Pinsky and August Pinsky, his partner, were brought in and spent every day up until the 31st of October when they signed off the case. And they were asked, well, what does that mean? Well, we weren't going to see her again. We weren't going to come to see her in the room every day. Nobody said, well, does that mean we're ever going to look at the records? There was never even a question at Plaintiff, well, did you ever go back and look at the records? I mean, they say there's impeachment. There's really no impeachment. It was never even set up. But he did say that he saw the chart indicating that she was on Alpiron, 300 milligrams. Correct? No, not Dr. Pinsky. He never acknowledged that a fax from DMG to CDH indicated that she was on Alpironol? Not that I'm aware of. He's the only physician, not the only physician, but unlike Dr. Kozeny and many others, his first contact with the decedent was on the 18th of October. He had no knowledge of her prior use of Alipironol. He said he took a history from the patient. He looked at Dr. Scruggs' history and Dr. Kozeny's history. Those are the three things he looked at for the medicines that she'd been on, and none of those listed Alipironol. I could be wrong. I thought I read in his testimony that he had seen a fax that she was on Alipironol but felt that his job was as an infectious disease doc and that was it. Well, he was asked if you had seen that she was on Alipironol, would that have changed anything you did? And he said, absolutely not. I never used the drug. It's not something I prescribe in my infectious disease practice. It's not an antibiotic. Had I known that, had I seen that, I would have expected the team, the primary care physicians, to fully investigate that. In fact, he testified that I suggested to Dr. Olmstead that she bring an allergist into the case to fully explore all the other drugs. He didn't think it was the vancomycin because that's something he does deal with. That's an antibiotic that he does work with. And so he believed they should look at all the other drugs. That was his position throughout the case. It just wasn't within the scope of what he was brought in to do. And even plaintiff's experts said he complied with the standard of care and what he was asked to do in ruling out infection. Nothing wrong there. He complied with the standard of care in recommending to the team that they bring in a specialist. Dr. Olmstead ultimately decided to bring in a dermatologist instead of an allergist, but that was her decision. So, again, within the scope of what he was asked to do, there was simply, even at the point of argument, no, he should have done more. I mean, they went to the jury on it, but he should have done more, dug in, got the bottles from the family, brought the family and dug into all this drug history and done this himself, despite the fact that that wasn't within the scope of what he was asked to do. And the jury understandably rejected that argument. Wasn't there, even earlier, before Dr. Pinsky was called in, some recommendation somewhere that there should be a complete drug survey taken while she was doing her dialysis? Well, that could be. Of course, that's what the recommendation is in this liver biopsy report. He was fully cross-examined. He never disputed that. He just said that's not within the scope of what I was brought in to do. I was brought in to rule out infection, see if there was some infection causing the fever or the rash. He ruled that out after, I don't know how many days that is, but over ten days. As a matter of humankind, that seems a little cruel. It's not my job. But as a matter of law, is that what we're here to talk about, the matter of law? Well, it's not a matter of law. That was his defense at the time. A matter of medicine. It's a matter for the jury, I would submit. But it wasn't like he said, well, I'm not going to talk about that with the other team. He talked about it with the team. After October 31st? No. His meeting with Dr. Olmstead, I think he said, was the next day. So that would be October 19th. And he said, I'm not convinced about the vancomycin. I think you ought to look at the other drugs. And I would suggest you get a consult, like an allergist, to come in here and help you do it. And he said, Dr. Olmstead, in my experience, is a very thorough physician. I'm sure she would have done it. And so, again, that's how you put together these teams. These are just consultants, primary care physicians, bring them in, not to take over the case, but to fill a function that they need. And in this case, they needed the infection looked at. That was ruled out. But it's not like he just said, well, I'm not going to give you my opinions on the other aspects of it. But, again, that was the jury issue. That's what they had to decide. Did he violate the standard of care or not? And they decided he didn't. So, counsel, is it your opinion that whether or not the subpoena was quashed, it would have changed Dr. Penske's verdict? No, not at all, Judge. I mean, again, it's not like he didn't – this wasn't brought out of him. He wasn't asked about it or it didn't come into evidence. It all did. He was fully cross-examined on it. I mean, the only thing that didn't come out was, did you look at this? Two days up, you said you didn't stop seeing the patient. But it was never – it just came up. Dr. Penske had already testified. Mr. Hawlett said, I'm not going to call him again. I'll examine him after the adverse examination is made, and he'll just testify once. And Blaine had him on an adverse, I think, for almost a whole day. He never said, okay, did you ever look at anything after he signed off? Or, I mean, he could have said, look, he could have – well, there's a pile of that printout. But, you know, does this refresh your recollection? Did you look at this stuff? I mean, he reported back to Dr. Penske. In other words, he's actually – he never tried to lay a Wilson v. Clark foundation that, hey, did you look at the audit trail, and does that affect anything about your opinion about Dr. Penske? So it just kind of came out of the blue. And then, you know, you've already brought out the timing issues and the lack of specificity. I mean, there was nobody to this day – I don't think we know who it is – that could come in and lay a foundation. You know, was it the button pusher or the person who designed the machinery? Dr. Cozzi's trial counsel said she wasn't going to agree. It's a business record, so I don't know. We never got that far. But certainly no abuse of discretion and no reverse of lear. So we would respectfully submit again that no matter how the initial appeal is resolved, that the judgment in favor of Dr. Penske and Midwest be affirmed. Thank you for your work. Thank you. All right, Mr. Larson. Thank you. I think if we've learned nothing else today in our discussion this morning, this is a difficult, confusing case with some very close facts, some controversial testimony by different actors. There is no question – God bless you, Your Honor – that this was a close case. And as our Illinois Supreme Court has said, where the case is a close one in the facts, and the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal. Any substantial error? Yes. What's the substantial error, Mr. Larson? I think the substantial error was created by the conduct of counsel in suggesting an obligation of Dr. Cozzi to testify to the standard of care, to not look the jury in the eye. Again, there was a curative instruction right after that, right? And there's case law, Your Honor, that says that that doesn't always cure the problem, that the prejudice that can be created is such that a curative instruction isn't sufficient to overcome that. And I think particularly in the case of this type, where the testimony on standard of care was so confusing and where the issues were so close and difficult, to kind of make that personal attack on Dr. Cozzi in closing argument one of the last things the jury heard certainly could have influenced the jury. When the central factual issue in the case was whether or not Mrs. Francisco was taking allopurinol after she left Central DuPage Hospital and plaintiff's counsel chose to volunteer, everybody knew she was on allopurinol. None of them testified in an objection. For counsel to testify to that in front of the jury was totally improper. But with respect to that argument, wasn't there some chart that was given? It was an exhibit that would be used by counsel for Dr. Penske. Right. And didn't that kind of lay out who had seen records? It did, which was all the more reason why for counsel to say, gosh, there are all these people that you haven't heard from that I didn't call to testify. They all would have said she was on allopurinol. When the facts are otherwise, and there's no way to cross-examine plaintiff's counsel on the veracity of that statement, creates error, and there's no way to cure it. Other than the nurses, who did not testify in this trial? There were several physicians that saw her after she left, some of the physicians at Loyola's burn unit, and I think saw her when she left. Well, at Loyola they put her just into comfort care and put her on medications that kept her comfortable. So that, and they hadn't said anything else. So, I mean, aren't we, in our jury system, aren't we to give our jurors some benefit of the doubt, and that's why we don't reverse them on a regular basis, that they are listening, and that they know that witness X did this, witness X did this, witness X did this. And, you know, can't we give them some benefit of the doubt? Certainly we can give them some benefit of the doubt that they didn't hear from these witnesses. And so they're hearing the plaintiff's counsel essentially using witnesses he chose not to call to testify to bolster his case that, gosh, she had to have been on allopurinol. We talked earlier about the lack of evidence in support of that, that if, in fact, as her own husband testified, she always follows doctors' directions. And the doctors, first of all, the direction she was given would have caused her to run out of the allopurinol before she left the hospital. But the doctor gave her 11 refills. And she never refilled them. That's clear evidence of the case. She didn't use those refills, and therefore she did not have any more medication. In fact, the allopurinol bottle that was presented at the time, I believe the evidence showed, had medication other than allopurinol in it at the time of her death. So there's no evidence whatsoever that she actually made those refills. And if she followed the doctor's direction, she would have run out of the allopurinol. Or if she wasn't following the doctor's directions, again, then what could Dr. Kozeny or Dr. DeJesus have told her that would have changed her behavior later when Dr. Briney very clearly said, these are the medications I want you on and no others? He was the one who last saw her before she left the hospital, and yet plaintiffs would argue that Dr. Kozeny and Dr. DeJesus could have said some magic words that would have gotten through to her to say, leave the allopurinol alone, never take it again. But again, that didn't make it into the jury instruction. Now, let's talk for a moment about the jury instruction. Before you do, getting back to the statements of a plaintiff's attorney just for one moment. In the closing argument, he had made some sort of statement about Dr. Kozeny not looking you in the eye and telling you that he met the standard of care, right? Yes, sir. That was objectionable in which Judge Souter instructed the jury upon. In the closing argument, did he address at all that statement that he had made, the speaking objection that he had made previous that, hey, all these other witnesses on the board know that she was on allopurinol? Did he address that in the closing argument or no? Did he come back and say those witnesses knew she was on allopurinol? Did he argue that later? I don't believe so. So that was just the speaking objection. It wasn't part of his closing argument, correct? Although I believe it was towards the end of the trial. Again, I don't believe he did the closing argument. And then one other just quick question. Dr. Vayner, first name is A-L-O-N. Yes. Is that a woman or a man? It's a man. It is a man. Okay, thank you. Somebody referred to him as a woman and I just wasn't sure. Thank you. One other question before we end. Isn't this, and I think Mr. Black alluded to it, isn't this a classic? And I don't want to say it's a classic Med-Mal case, but it's a battle of the experts, isn't it? Well, one expert testified to a different standard of care than the other. Certainly there was conflicting testimony. As typically in a Med-Mal case? Certainly. Although I think when one expert, and we've talked about this at nauseam today, lacked a foundational basis, was speculating as to what allopurinol was taken, when it was taken, how much was taken, whether it was taken after she left the hospital or not. And another has testified to the actual facts of the case. I don't think it's a fair balance to just say, well, they're both giving testimony. Certainly in every case. Isn't that the job of the defense attorney to point out the inconsistencies or to question through cross-examination, through closing argument, the validity of the expert's testimony? I think that was done here. That was done. The jury still didn't rule the way you wanted them to rule. Therefore, you're going to come in here and ask us to reverse the jury verdict. Again, what's the standard of review for us to reverse a jury's verdict? It is whether or not the jury's verdict was a reasonable one of the facts of the case, assuming that the evidence that they heard was admissible and appropriate evidence, which we've argued it was not. And I think there's that big issue out there regarding proximate cause. Three issues that were in the issues instruction didn't get you to proximate cause. The one that would have, arguably, was you needed to tell her never to take it again. Did they object to that at the time? Did the plaintiffs object to it? Yes. No, this was their submitted issues instruction. Did the defense object to the jury instructions that were submitted? No, we had no reason to. We were fine with the instruction because we knew they hadn't proved that aspect of the case. Okay, so you were fine with the instructions, but then when the jury rules against you in the instructions, now there's something wrong with the instructions. Your Honor, I've never once suggested that there's anything wrong with the instructions. What I've suggested is there's something wrong with the testimony. The instructions are correct. The standard testified to by Dr. Vayner was not. The instructions on the issues instructions were correct. The plaintiff who submitted the issues instruction chose not to ask the jury to decide, did the standard of care require that Dr. Cozzi and Dr. DeJesus tell this patient never take this drug again? It's the plaintiff's burden to put an appropriate issues instruction to the court. They didn't include that in the issues instruction. That's not my problem. They didn't ask the jury to decide that question, and because the jury didn't decide that question, we don't know whether they would have decided in favor of the defense or the plaintiff. Certainly, the testimony was on either side of that, but that was the only part of the plaintiff's case that would have given the approximate cause, and for whatever reason, they didn't ask the jury to consider that in the issues instruction. So we were not objecting to the instructions. We were fine with the instructions. I think the plaintiff may have wanted to object to their own instruction because they left that out. All right. You were fine with the instructions at trial. By the time this appeal came up, you apparently weren't fine, but you didn't talk about it until your reply brief. Again, Your Honor, I have no objection to the issues instructions or to any of the jury instructions. I'm not objecting that. If I was objecting that the jury was improperly instructed, certainly, and I hadn't raised that in post-trial, then I would have waived that issue. I'm not objecting that the jury was improperly instructed. I'm objecting that. Well, you're saying they were improperly instructed for their verdict. No, I think what I'm saying, Your Honor, is they reached an unreasonable verdict given the instructions that they were given. They must have reached a conclusion that they weren't asked to reach, which is different from saying the instruction wasn't there. If they decided the case, you know, we really think Dr. Cozeny should have told the patient never take this drug again and that's the act of negligence we're going to rely upon, they weren't asked to make that decision in the issues instructions. So the instruction was fine. What they did with the instruction was improper. All right. Anything else? No. Thank you. Thank you very much for your time. Mr. Black. Briefly, Your Honor, is on rebuttal on the separate appeal. Mr. Griffin was correct that Dr. Pinsky was cross-examined at pages 1408 through approximately 1420 on whether he saw the biopsy report and he stated that he had no recollection of reviewing it, that if he had seen it he would have taken note, he had already ruled out infection so there was nothing else for him to look at, there was nothing for an infectious disease specialist to look at in regard to that report. He was called in to evaluate evidence of a drug reaction. So his knowledge, you're saying that from that testimony, his knowledge comes from the fact that it's now placed in his face and he's talking about it. Well, I want to differentiate between the manifest weight of the evidence issue and the issue on the motion to quote. He certainly gave this testimony that, you know, I wasn't aware of it, it wouldn't have made a difference, I just called in for the infectious disease and that's standard and consistent with what his expert testified to. However, he did give testimony that I don't have any recollection of it. He, the motion to quash was to bring out that aspect before the jury that, well, here it shows that he did look at it on November 2 when he said he signed off on October 31. Would that have changed in light of the fact that he was an infectious disease doctor? Why would it have changed his duty based on the standard? Well, there were two different duties expressed for him. Certainly Dr. McDonald, who was the plaintiff's expert, said he did have a duty to do a thorough drug history and to follow up on things and not just leave it in the hands of the primary care physician. Even if there was no infection ultimately found? Or this should have been done just as he walked in the door? The Dr. McDonald testified that he was part of the team, just as much as part of the team as any other physician. And although he was brought in to look for the infectious disease, this is still something that the overall team should be looking at. Where is the thorough drug history? So in terms of that aspect, that is, again, what took me at the motion to quash, as opposed to the manifest way for right now, that that is something that would have been a critical factor. We have, yes, our experts did testify. His job is limited to X. Is there an infectious disease? Nothing else for him to do. It's not his obligation to look at everything out and therefore there was assessment. But still we have this important and significant aspect of his testimony. I signed off on October 31. Here's the audit trail. The audit trail says you looked at it for whatever reason or whatever you wanted to do with it. You looked at it. The audit trail says take a thorough drug history. That dovetails into one aspect of the expert testimony, granted, as opposed to the other. But it's still something that we believe was a particularly relevant piece of evidence to allow the jury to resolve this properly. But he's, and when he says I don't really have any recollection of it, he saw it about six and a half years earlier. This trial did not commence until almost six and a half years after she died. Correct, Your Honor. He hasn't been in any other trials. He hasn't seen any other situations. I mean, that's maybe not unreasonable. So now the jury's going to hear, well, wait a minute. You actually did see it on November 2. And he's going to say I did, but I was no longer a member of the team as of October 31. How is that going to change what happened? I think that has the potential, the significant potential of changing how the jury would have resolved the issues as to Dr. Pinsky. By also having this aspect of things. You've got one side saying I signed off, I'm only the infectious disease. You've got the other side saying, oh, no, you've got to do more than that, you're part of the team. And then you've got this issue of saying I signed off and didn't do anything else, but then I looked at it again. It's all part and parcel of how this goes towards each expert's viewpoint. So you wanted the jury to have the opportunity to see that report? Yes. Or to see the audit trail, to have somebody come in, testify as to the audit trail. That was important. That was important. So don't you think that plaintiff's lawyer should have been subpoenaed sooner than seven days out or five or six days out? You don't have to answer that in light of the fact that he's high-natured. From the record, I know what happened and I see what happened and how things played out. From the record, there still was seven days left to trial. Thank you, guys. Thank you. And Mr. Griffin? Anything else? And you're welcome. You've got some time. I wasn't sure. I thought there was somebody said he wanted the jury to see the document, and they did. I don't know if it was formally admitted or not, but again, on those pages that I referred to, he was fully cross-examined on the document, on the content of it. What he said was, you know, he said maybe, maybe I did. He quickly said, I didn't say, I don't know, when it got in the record, I might have seen it, what he said. And then he was cross-examined on the full aspect of it. And again, I didn't say the standard, but you know it well. I mean, to reverse a trial verdict like this, you've got to have substantial gear that would have affected the outcome of the trial. But isn't quashing a subpoena or precluding evidence from coming in the absolute last resort for a trial court judge? You know, as Mr. Black argues, this was an important piece of evidence. It really wasn't in violation of 237. We were right on the cusp there. But shouldn't that be weighed by a trial court judge in determining whether you do the ultimate, a barring testimony? Well, again, I would respectfully submit that the judge did do that. I'm going to get my glass of water. You know, he heard, by the way, this was, you know, this is another lawyer arguing all this. This wasn't Dr. Pinsky's lawyer. But she was arguing that, you know, you didn't give me enough time. You haven't told me who it is. You know, I asked you. Well, hadn't they argued they had worked with the hospital before? The hospital never had a problem with this before. They barred in whomever it was. But she tendered to him an e-mail that she had written to him. You've got to tell me more about who it is you want. Who do you want? Do you want the button put here? Do you want the guy that designed the system? We don't know really whether, you know, somebody was going to come in that would lay the foundation or not for the audit trail. But, again, I think I made it clear. It's just the audit trail isn't the liver biopsy report. I mean, that got in, the content of that and the language that he likes about you better look at the drug history and you better see whether this is a drug injury. That all came in. And that's what Dr. Pinsky was testifying throughout the case, that he believed that's true and he recommended to the team that they do that. And then his view, they did that. They didn't get an allergist, as he suggested, but they did bring in a dermatologist. And so that, you know, it wasn't that he said, well, you know, I'm not touching it. That was his recommendation beyond even his own job of ruling out infection. So, again, the idea that he would have looked at that two days later and it said what he was saying throughout the trial as his view of what was going on and what should be done. I mean, the biopsy didn't say Dr. Pinsky should be doing a drug test and following up on the drugs. What I think I'm hearing you saying is even if the court was incorrect in quashing this subpoena, no harm, no foul, because that came in anyway. Absolutely. I mean, he was, at least I don't think he gives discretion in his initial ruling. You already brought out that this was an issue that claimed a lawyer. I mean, these depositions where he said he signed off on it two or two years ago, I mean, he said the same thing at trial when he signed off. This audit report had been in the possession of claims counsel for two years, so I don't think there was an abuse of discretion in the first instance. Thank you. Thank you very much. Thank you, sir. All right. We will take this matter under advisement. Thank you very much for your argument this morning. We will stand in recess to prepare for our next case, and we're going to pull out our drug list and see what we're taking.